UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NATIONAL GEAR & PISTON, INC.,

                                        Plaintiff,                           Case No. 10-CV-4145 (KMK)

           -against-                                                         OPINION AND ORDER

CUMMINS POWER SYSTEMS, LLC and
CUMMINS INC.,
                                        Defendants.

Appearances:
Nancy A. Luongo, Esq.
Harrison, NY
*Counsel for Plaintiff*

Samuel Goldblatt, Esq.
Kathleen C. Burns, Esq.
Nixon Peabody LLP
New York, NY
*Counsel for Defendant Cummins Inc.*

KENNETH M. KARAS, District Judge:

        National Gear & Piston, Inc. ("Plaintiff") originally filed this suit against Cummins

Power Systems, LLC ("CPS") and Cummins Inc. ("Cummins") (collectively "Defendants") in

state court in 2010, and Defendants removed it to this Court shortly thereafter.  By an Opinion

and Order entered on May 16, 2012, the Court dismissed all of the claims in Plaintiff's Amended

Complaint without prejudice, but granted Plaintiff leave to file a Second Amended Complaint.

Plaintiff filed the Second Amended Complaint on June 29, 2012, asserting claims for breach of

the duty of good faith and fair dealing, tortious interference with prospective business

opportunities, breach of contract, and violations of federal and state antitrust laws—i.e., 15

U.S.C. § 1 ("the Sherman Act"), and New York General Business Law § 340(1) ("the Donnelly

Act")— against both Defendants.  Now before the Court is Cummins's Motion To Dismiss all of

Plaintiff's claims.  For the reasons explained below, Cummins's Motion is granted.

## I. Background

The Court set forth the history of this dispute in a prior Opinion and Order, *National

Gear & Piston, Inc. v. Cummins Power Systems, LLC*, 861 F. Supp. 2d 344 (S.D.N.Y. 2012).

The Court assumes the Parties' familiarity with the underlying factual background, and will

describe the history, as well as the new allegations in the Second Amended Complaint, only as

relevant to the resolution of the instant Motion.

### A. History

Plaintiff is a New York-based corporation in the business of providing infrastructure

support as a supplier and servicing agent for essential automotive components for its customers,

including public agencies such as the New York Metropolitan Transit Authority ("MTA") and

the New York City Transit Authority ("NYCTA").  (2d Am. Compl. ("SAC") ¶¶ 1, 8.)

Defendant CPS is a Delaware-based limited liability company, formed as a joint venture

between Defendant Cummins, an Indiana-based corporation, and R. Scott Patrohay ("Patrohay"),

the current president of CPS.  (*Id.* ¶¶ 2–4; *see also id.* ¶ 23.)  Cummins still retains an equity

membership interest in CPS; indeed, according to the allegations in the Second Amended

Complaint, Cummins is the beneficial owner of eighty-two percent of the membership interest of

CPS.  (*Id.* ¶¶ 5–6.)

Plaintiff is an authorized dealer of engine parts and maintenance items manufactured by

Cummins.  (*Id.* ¶ 9.)  Cummins does not deal directly with end users; instead, it appoints

authorized distributors on a territorial basis, and the distributors appoint authorized dealers,

which interact directly with end users.  (*Id.* ¶ 10.)  Plaintiff became an authorized dealer for

Cummins Metropower, Inc. ("CMP") in the late 1990s.  CMP was ultimately acquired by CPS.  (*Id.* ¶¶ 11, 25.)  The relationship between CMP and Plaintiff was set forth in an agreement in 2007—which agreement, although never signed, was adhered to by both Plaintiff and CMP during the course of their relationship.  Plaintiff alleges that the agreement was a form agreement prepared by Cummins.  (*Id.* ¶¶ 13–14; *see also id.* ¶¶ 15–18.)

Both CMP and CPS acted as upstream distributors to Plaintiff.  Each entity maintained a first-level business-to-business relationship with Cummins on behalf of Plaintiff.  (*Id.* ¶ 20.)  But both CMP and CPS were also functionally Plaintiff's competitors, because each also distributed Cummins products to authorized dealers and to end users, and each bid on the same contracts that Plaintiff did.  (*Id.* ¶ 21.)  CPS never offered Plaintiff a written agreement as to the terms of their relationship; for at least some time after CPS's formation, however, Plaintiff and CPS "continued to function under the contractual relationship as existing between CMP and [Plaintiff]," (*id.* ¶ 24), and CPS has acknowledged that after it acquired CMP, it "continued the relationship with Plaintiff pursuant to the terms of [the] unsigned . . . [a]greement."  (*Id.* ¶ 25 (internal quotation marks omitted).)

According to Plaintiff, at some point in or about fall 2009, CPS "began instituting increasingly onerous, unnecessary and unlawful business practices affecting its contractual relationship with [Plaintiff], all of which actions were intended to deprive [Plaintiff] of its effective operation as an authorized dealer[ and to] destroy [Plaintiff's] business model . . . ."  (*Id.* ¶ 29.)  Plaintiff tried to comply with CPS's new policies and requirements, and it alleges that CPS took retaliatory and unlawful steps when Plaintiff failed to comply—including, eventually, attempting to terminate its agreement with Plaintiff.  (*See id.* ¶¶ 41, 59–64.)  Plaintiff's claims against CPS, as set forth in both the Amended Complaint and the Second Amended Complaint,

arise from CPS's conduct and allegedly unlawful actions against Plaintiff.  Plaintiff asserts claims for breach of the duty of good faith and fair dealing, tortious interference with prospective business opportunities, breach of contract, Sherman Act violations, and Donnelly Act violations.

Plaintiff asserts the same claims against Cummins.  The Court previously held that Plaintiff, in its Amended Complaint, had failed adequately to plead a basis for finding that Cummins was either directly or indirectly liable on an alter-ego/veil-piercing theory for CPS's allegedly unlawful actions against Plaintiff. *See Nat'l Gear*, 861 F. Supp. 2d at 375–77.  In its Second Amended Complaint, Plaintiff attempted to cure the pleading deficiencies by alleging new facts regarding the relationship between CPS and Cummins.

### B. The Newly Alleged Facts

In the previously dismissed Amended Complaint, Plaintiff alleged, in support of Cummins' liability, that Cummins was aware of the allegedly unlawful actions taken by CPS, and that Cummins failed to respond in writing to a letter sent by Plaintiff regarding CPS's conduct or otherwise to direct CPS to alter its conduct.  (Am. Compl. ¶¶ 61–63.)  In its Second Amended Complaint, Plaintiff sets forth a number of additional facts to support its claims against Cummins.  For the purposes of deciding the instant motion, the Court assumes these allegations to be true.

Plaintiff alleges that CPS was established in 2007 as a joint venture between Cummins and CPS's current president, Patrohay.  (SAC ¶ 91.)  Prior to the formation of CPS, Cummins had employed Patrohay in "a series of executive positions" from 1988; after the formation, he was appointed president of CPS in January 2008.  (*Id.* ¶¶ 96–97.)  Moreover, according to Plaintiff, Cummins "follows a pattern and practice of appointing [its] executive staff to positions

in its wholly owned and partially owned distributor subsidiaries." (*Id.* ¶ 98.)  Additionally, the CPS website "prominently" features the "Service Years with Cummins" of its executives, including both Patrohay and CPS Vice President Karl Gontkof, who have served with Cummins for twenty-three years and thirty-five years, respectively.  (*Id.* ¶¶ 99–101.)  The website also indicates Gontkof's status as an active member of the "Cummins Truck Engine Council," although Plaintiff does not explain what this council is, or how it functions.  (*See id.* ¶ 101.) According to Plaintiff, this alleged pattern of executive overlap "indicates a continuous period of professional engagement by a unitary, integrated corporate structure."  (*Id.* ¶¶ 99–101.)

Plaintiff further alleges that in addition to sharing overlapping management, CPS and Cummins are "inextricably interconnected" based on Cummins's overall corporate structure. (*Id.* ¶ 90.)  Indeed, Cummins has described itself in a press release as "a corporation of complementary business units that design, manufacture, distribute, and service engines and related technologies."  (*Id.* ¶ 91 (emphasis and internal quotation marks omitted).)  Plaintiff relatedly asserts, upon information and belief, that the "near entirety" of the original CPS capital contribution was provided by Cummins, and that Cummins currently holds eighty-two percent of the equity membership in CPS.  (*Id.* ¶¶ 92–93.)  As a Cummins subsidiary, CPS's financial information is incorporated into Cummins' quarterly and annual financial reports, and informational meetings between Cummins and CPS are conducted on an annual basis.  (*Id.* ¶¶ 94–95.)  Plaintiff also states that by including CPS's financial information in its disclosures, Cummins reaps a financial benefit—although Plaintiff does not specify the nature or extent of that benefit.  (*Id.* ¶ 107.)  As further support of the interconnectedness of the two corporations, Plaintiff alleges that in its most recent 10-K filing, Cummins stated that its Distribution Segment manages the performance and capabilities of its network of subsidiary distributors and that two

5

of its three principal distribution facilities are operated by CPS.  (*Id.* ¶¶ 108–09.)  Cummins also indicated in that filing that its products are supplied to its customers through its wholly and partially owned subsidiaries.  Plaintiff notes that Cummins employs words such as "we" and "our" throughout its literature, seemingly in reference to its subsidiaries.  (*Id.* ¶ 110.)

Finally, Plaintiff states that Cummins was free to terminate its relationship with CPS at any time for CPS's violations of the Cummins Business Code of Conduct, as further evidence of Cummins' control over CPS.  (*Id.* ¶¶ 111–12.)  As in the Amended Complaint, Plaintiff asserts that despite having knowledge of CPS's conduct in its dealings with Plaintiff, Cummins took no action to correct CPS's alleged misconduct.  (*Id.* ¶¶ 115–17.)

## II. Discussion

### A. Standard of Review

#### Rule 12(b)(6) Motion To Dismiss

In considering Cummins's Motion To Dismiss, the Court is required to consider the factual allegations contained in the Complaint as true.  *See Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008) ("We review *de novo* a district court's dismissal of a complaint pursuant to Rule 12(b)(6), accepting all factual allegations in the complaint and drawing all reasonable inferences in the plaintiff's favor." (internal quotation marks omitted)); *Gonzalez v. Caballero*, 572 F. Supp. 2d 463, 466 (S.D.N.Y. 2008) (same).  Moreover, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken."  *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (internal quotation marks omitted).

6

The Supreme Court has held that "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his [or her] 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (third alteration in original) (citations omitted).  Instead, the Court has emphasized that "[f]actual allegations must be enough to raise a right to relief above the speculative level," *id.*, and that "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563. Plaintiffs must allege "only enough facts to state a claim to relief that is plausible on its face." *Id.* at 570.  But if a plaintiff has "not nudged [his or her] claims across the line from conceivable to plausible, the[] complaint must be dismissed."  *Id.*; *see also Aschroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (alteration in original) (citation omitted) (quoting Fed. R. Civ. P. 8(a)(2))).

B. Analysis

With one exception, Plaintiff primarily seeks to impose liability on Cummins *indirectly*, based on an alter-ego/veil-piercing theory and on a franchisor-franchisee/agency theory. Plaintiff also asserts, however, that Cummins was "directly involved in the circumstances underlying Plaintiff's [claim] for interference with prospective business relations."  (Mem. of Law in Opp'n to Cummins's Mot. To Dismiss Pursuant to Federal Rule of Civil Procedure

12(b)(6) ("Pl.'s Mem.") 7; *see also* SAC ¶¶ 126–40.)  The Court will first consider Plaintiff's

direct attack on Cummins, and then it will turn to Plaintiff's theories of Cummins's indirect

liability.

### 1. Choice of Law

Federal jurisdiction over the instant dispute is based on the Parties' diversity of

citizenship; therefore, the choice of law rules of New York, the forum state, apply.  *See Cantor*

*Fitzgerald Inc. v. Lutnick*, 313 F.3d 704, 710 (2d Cir. 2002) ("To determine which state's law

applies, a federal court sitting in diversity must apply the conflict-of-laws rules of the state in

which the federal court sits.").  Neither Party has addressed which body of state law—New

York, Delaware, or Indiana—governs Plaintiff's various claims and theories of liability.  As a

general matter, "[t]he first step in any case presenting a potential choice of law issue is to

determine whether there is an actual conflict between the laws of the jurisdictions involved."

*MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, 965 N.Y.S.2d 284, 292 (Sup. Ct. 2013)

(internal quotation marks omitted); *see also Jimenez v. Monadnock Constr., Inc.*, 970 N.Y.S.2d

577, 580 (App. Div. 2013) (same).  "In the absence of substantive difference . . . a New York

court will dispense with choice of law analysis; and if New York law is among the relevant

choices, New York courts are free to apply it."  *MBIA Ins. Corp.*, 965 N.Y.S.2d at 292 (internal

quotation marks omitted).  Moreover, where the Parties exhibit implied consent to a particular

body of substantive law, such consent "is, of course, sufficient to establish the applicable choice

of law."  *Arch Ins. Co. v. Precision Stone, Inc.*, 584 F.3d 33, 39 (2d Cir. 2009).  Where there is

an actual conflict, however, New York has adopted an "interest analysis" approach to

choice-of-law questions, "intended to give controlling effect to the law of the jurisdiction which,

because of its relationship or contact with the occurrence or the parties, has the greatest concern

with the specific issue raised." *Fin. One Public Co. v. Lehman Bros. Special Fin.*, 414 F.3d 325,

337 (2d Cir. 2005); *see also Babcock v. Jackson*, 191 N.E.2d 279, 283 (N.Y. 1963).

The Court will, as necessary, address which body of law governs each of Plaintiff's

theories of Cummins's liability.

### 2. Direct Liability

Plaintiff argues that the Second Amended Complaint contains sufficient factual

allegations to support a direct claim against Cummins for tortious interference with Plaintiff's

business relations.  (Pl.'s Mem. 7–9.)  But in support of this claim, Plaintiff cites *no authority*

*whatsoever*.[1]  And, more problematically, virtually all of the allegations in the Second Amended

---

[1] This omission of authority makes the choice-of-law analysis more difficult.  It appears
to the Court, however, that the only difference between New York, Delaware, and Indiana law
insofar as this claim is concerned is Indiana's requirement that, to be liable, a defendant must
have acted unlawfully, as opposed to merely intentionally or otherwise wrongfully.  *See Nadel v.
Play-by-Play Toys & Novelties, Inc.*, 208 F.3d 368, 382 (2d Cir. 2000) ("Under New York Law,
the elements of a claim for tortious interference with prospective business relations are: (1)
business relations with a third party; (2) the defendant's interference with those business
relations; (3) the defendant acted with the sole purpose of harming the plaintiff or used
*dishonest, unfair, or improper means*; and (4) injury to the business relationship." (emphasis
added)); *In re Verestar, Inc.*, 343 B.R. 444, 484 (Bankr. S.D.N.Y. 2006) ("Under Delaware
law . . . a plaintiff must allege the following elements to state a claim for tortious interference
with prospective business relationships: (i) the existence of a valid business relationship . . . , (ii)
knowledge of the relationship . . . on the part of the defendant, (iii) intentional interference that
induces or causes a breach or termination of the relationship . . . , (iv) *intentional or wrongful
conduct*, and (v) resulting damages to the party whose relationship . . . has been disrupted."
(emphasis added)); *Graves v. Kovacs*, 990 N.E.2d 972, 976–77 (Ind. Ct. App. 2013) ("The
elements of a cause of action for tortious interference with a contract are: (1) the existence of a
valid and enforceable contract; (2) the defendant's knowledge of the existence of the contract;
(3) the defendant's intentional inducement of the breach of contract; (4) the absence of
justification; and (5) damages resulting from the defendant's wrongful inducement of the
breach." (internal quotation marks omitted)); *Melton v. Ousley*, 925 N.E.2d 430, 440 n.9 (Ind.
Ct. App. 2010) ("The elements of [a claim for tortious interference with a business relationship
and tortious interference with a contractual relationship] are the same with the following
exceptions: (1) the first does not require a showing of the existence of a valid contract; and (2)
*the second does not require a showing of illegality*." (emphasis added)); *see also Lasker v. UBS
Sec. LLC*, 614 F. Supp. 2d 345, 357 n.24 (E.D.N.Y. 2008) ("[T]he elements of New York's tort

Complaint offered in support of this claim describe actions taken by CPS—not by Cummins. (*See* SAC ¶ 130 ("Notwithstanding the fact that Plaintiff was . . . the low bidder [on a request for bids with NYCTA], [Plaintiff] was informed by a representative of NYCTA that *CPS had communicated to NYCTA* that [Plaintiff's] bid was inappropriate . . . ." (emphasis added)); *id.* ¶ 133 ("Upon information and belief, NYCTA cancelled [Plaintiff's] bid because of the information communicated *by CPS* to NYCTA." (emphasis added)); *id.* ¶ 134 ("Upon information and belief, *CPS was the only bidder* besides [Plaintiff] on [this] request for [b]ids . . . ." (emphasis added)); *id.* ¶ 135 ("Upon information and belief, CPS was awarded a contract by NYCTA . . . ."); *id.* ¶ 136 ("By its actions with respect to [this] [r]equest for bids . . . *CPS unlawfully, maliciously and with intent to harm interfered* with [Plaintiff's] prospective business relationship with NYCTA . . . ." (emphasis added)); *id.* ¶ 137 ("*The onerous, unnecessary and unlawful interference by CPS* with a prospective business relationship between [Plaintiff] and NYCTA . . . was undertaken *by CPS maliciously, with an intent to convert a business opportunity* properly controlled by [Plaintiff] *to CPS' sole benefit* and advantage and in order to effectuate its scheme to restrain trade . . . ." (emphases added)).[2]

---

of tortious interference with prospective economic advantage and Delaware's tort of tortious interference with business relations are substantially similar . . . ."). That difference is immaterial here, because of the other deficiencies in Plaintiff's pleadings in support of this claim. The Court therefore need not engage in a complete choice-of-law analysis to resolve Defendants' Motion.

    [2] Plaintiff's Memorandum of Law similarly focuses on a communication between "Ms. Kristy Kibler, *an employee of CPS*," and "NYCTA," in which she "informed NYCTA that [Plaintiff's] bid was improper." (Pl.'s Mem. 8 (emphasis added).) Plaintiff does not allege that Ms. Kibler is also an employee of Cummins or that she was acting on instruction from Cummins when she allegedly interfered with Plaintiff's relationship with NYCTA. Instead, Plaintiff tellingly states that it would like to ask Cummins: "Did this instruction come directly from Cummins? If so, for what reason?" (*Id.* at 9.) But Plaintiff has "no right to obtain discovery on a claim that [it] has not adequately pled." *Lopes v. Mellon Investor Servs.*, No. 07-CV-5928,

Indeed, the only allegations in the Second Amended Complaint regarding Cummins's involvement in the alleged interference with Plaintiff's business opportunities with NYCTA are the following:

> Cummins Inc. acts as a corporate alter ego of CPS, and has and did have authority to exercise corporate control over CPS.  By its activity or failure to act, Cummins Inc. participated in the actions of CPS with regard to the unlawful and tortious interference with [Plaintiff's] prospective business relationship with NYCTA . . . .

> Cummins Inc. acts as a franchisor to CPS and, in addition, in its Business Code of Conduct, undertakes to be responsible for the actions of CPS, as a third party operating on its behalf.  By its activity or failure to act, Cummins Inc. participated in the actions of CPS with regard to the unlawful and tortious interference with National's prospective business relationship with NYCTA . . . .

(*Id.* ¶¶ 138–39; *see also id.* ¶¶ 126–29, 131–32, 140.)

In other words, as with its Amended Complaint, "[n]owhere [here] does" Plaintiff "allege any unlawful conduct by Cummins," separate from Cummins's alleged indirect involvement in CPS's conduct, *Nat'l Gear*, 861 F. Supp. 2d at 375.  Consequently, Plaintiff's direct-liability claim against Cummins "is not 'plausible on its face' and must be dismissed." *Id.* (quoting *Twombly*, 550 U.S. at 555).

### 3. Alter-Ego/Veil-Piercing Claim

The Court next considers Plaintiff's theories of why Cummins is *indirectly* liable for each of Plaintiff's claims—i.e., breach of the duty of good faith and fair dealing, tortious interference with prospective business opportunities, breach of contract, Sherman Act violations, and Donnelly Act violations.

---

2007 WL 4258189, at *3 (S.D.N.Y. Dec. 3, 2007); *cf., e.g.*, *Navarra v. Marlborough Gallery, Inc.*, 820 F. Supp. 2d 477, 487 (S.D.N.Y. 2011) (granting motion to dismiss where plaintiff relied on assertions that were "speculative and conclusory").

The choice-of-law analysis is straightforward with respect to Plaintiff's alter-ego/veil-piercing theory of liability.  "Under New York choice of law principles, the law of the state of incorporation determines when the corporate form will be disregarded and liability will be imposed on shareholders."  *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995) (alterations and internal quotation marks omitted); *see also Phillips v. Reed Grp., Ltd.*, No. 07-CV-3417, 2013 WL 3340293, at *19 (S.D.N.Y. July 1, 2013) (same).  CPS, the subsidiary, is a Delaware-based corporation, and Cummins, the parent, is an Indiana-based corporation.  Because Plaintiff seeks to disregard the subsidiary's (CPS's) corporate form and hold the parent (Cummins) liable, Delaware law governs Plaintiff's veil-piercing attack.  *See Nat'l Gear*, 861 F. Supp. 2d at 375 n.12 ("The Court looks to Delaware law to address the alter ego/veil piercing theory, as CPS is a Delaware limited liability company."); *see also Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 476 F. Supp. 2d 913, 932 (N.D. Ill. 2007) (noting that, under Illinois law, "the law of the state of incorporation governs" a veil-piercing action, and accordingly applying Illinois law to the question of whether to pierce the Illinois-based subsidiary's veil to hold Delaware parent liable, and applying Delaware law to the question of whether to pierce the Delaware-based parent's veil to hold shareholders liable), *aff'd in relevant part,* 529 F.3d 371, 378 (7th Cir. 2008) ("The district court correctly applied the law of Illinois and Delaware to [plaintiff's] veil-piercing claims.").

It is a basic principle of corporate law that a parent will not be held liable for the acts of its subsidiaries.  *See United States v. Bestfoods*, 524 U.S. 51, 61 (1998).  Moreover, "Delaware courts" especially "take the corporate form very seriously and will disregard it only in the exceptional case"; Plaintiff, therefore, faces a "heavy burden."  *Soroof Trading Dev. Co. v. G.E. Microgen, Inc.*, 283 F.R.D. 142, 150 (S.D.N.Y. 2012) (ellipsis and internal quotation marks

omitted).  As the Second Circuit has explained, "Delaware law permits a court to pierce the corporate veil of a company 'where there is fraud *or* where [it] is in fact a mere instrumentality or alter ego of its owner.'"  *Fletcher*, 68 F.3d at 1457 (alteration in original) (emphasis added) (quoting *Geyer v. Ingersoll Publ'ns Co.*, 621 A.2d 784, 793 (Del. Ch. 1992)); *see also PSG Poker LLC v. DeRosa-Grund*, No. 06-CV-1104, 2008 WL 190055, at *8 (S.D.N.Y. Jan. 22, 2008) (same).  In other words, to prevail, Plaintiff need not allege that CPS and Cummins engaged in actual fraud.  *See NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 176 (2d Cir. 2008) ("To prevail under the alter-ego theory of piercing the veil, a plaintiff need not prove that there was actual fraud . . . ."); *Wilson v. Thorn Energy, LLC*, 787 F. Supp. 2d 286, 294 (S.D.N.Y. 2011) (same); *see also Fletcher*, 68 F.3d at 1457 (citing *Harper v. Del. Valley Broadcasters, Inc.*, 743 F. Supp. 1076, 1085 (D. Del. 1990)).  Instead, under Delaware law, Plaintiff must show that the parent and the subsidiary operated as a "single economic entity," and that an "overall element of injustice or unfairness" is present.  *Nat'l Gear*, 861 F. Supp. 2d at 376 (internal quotation marks omitted) (quoting *Fletcher*, 68 F.3d at 1457); *see also NetJets*, 537 F.3d at 176 (holding that "plaintiff need not prove that there was actual fraud but must show a mingling of the operations of the entity and its owner plus an overall element of injustice or unfairness" (internal quotation marks omitted)); *Fletcher*, 68 F.3d at 1457 (same).  *See generally Bestfoods*, 524 U.S. at 62 ("[T]here is a[] . . . fundamental principle of corporate law, applicable to the parent-subsidiary relationship as well as generally, that the corporate veil may be pierced and the shareholder held liable for the corporation's conduct when, *inter alia*, the corporate form

13

would otherwise be misused to accomplish certain wrongful purposes, most notably fraud, on the shareholder's behalf.").[3]  The Court will consider each factor in turn.

### a. Single Economic Entity

To satisfy the first factor, Plaintiff must allege more than "'mere domination and control of the subsidiary by the parent corporation.'"  *In re Sunbeam Corp.*, 284 B.R. 355, 366 (Bankr. S.D.N.Y. 2002) (quoting *Outokumpu Eng'g Enters., Inc. v. Kvaerner Enviropower, Inc.*, 685 A.2d 724, 729 (Del. Super. Ct. 1996)).  Demonstrating that the parent and subsidiary are a single economic entity requires a showing of "exclusive domination and control . . . to the point that" the subsidiary "no longer ha[s] legal or independent significance of [its] own." *Wallace ex rel. Cencom Cable Income Partners II v. Wood*, 752 A.2d 1175, 1184 (Del. Ch. 1999) (alterations in original) (internal quotation marks omitted); *see also Union Carbide Corp. v. Montell N.V.*, 944 F. Supp. 1119, 1144 (S.D.N.Y. 1996) ("Plaintiff must show that the owners exercised complete domination of the corporation in respect to the transaction attacked." (internal quotation marks omitted)); *In re Sunbeam Corp.*, 284 B.R. at 366 (same); *O'Leary v. Telecom Res. Serv., LLC*, No. 10C-03-108, 2011 WL 379300, at *7 (Del. Super. Ct. Jan. 14, 2011) ("The degree of control that would be required to 'pierce the veil' . . . would be a degree of control by the parent corporation that the subsidiary no longer has legal or independent significance of its own.").

As this Court explained in its previous ruling, in evaluating whether the parent and subsidiary are a single economic entity, courts look to the following factors:

---

[3] The two-part Delaware law test applies to limited liability corporations, such as CPS, as well as to corporations.  *See NetJets*, 537 F.3d at 176 ("Given the similar liability shields that are provided by corporations and LLCs to their respective owners, [e]merging caselaw illustrates that situations that result in a piercing of the limited liability veil are similar to those [that warrant] piercing the corporate veil." (internal quotation marks omitted)).

> whether the corporation was adequately capitalized for the corporate undertaking; whether the corporation was solvent; whether dividends were paid, corporate records kept, officers and directors functioned properly, and other corporate formalities were observed; whether the dominant shareholder siphoned corporate funds; and whether, in general, the corporation simply functioned as a facade for the dominant shareholder.

*National Gear*, 861 F. Supp. 2d at 376, (quoting *NetJets*, 537 F.3d at 177); *see also Fletcher*, 68 F.3d at 1457 (same); *Wilson*, 787 F. Supp. 2d at 295 (same).  But while these so-called *Fletcher* factors are most frequently considered in the context of a veil-piercing attack, a Plaintiff may survive a motion to dismiss by pleading other relevant allegations regarding the parent's complete domination.  *See In re Sunbeam Corp.*, 284 B.R. at 365, 368 (explaining that "even in the absence of allegations of these specific factors, a court may not grant a motion to dismiss where the plaintiff has made other relevant allegations"; and considering, but finding insufficient, plaintiff's non-*Fletcher* factor allegations that the parent dominated the affiliate throughout a decisionmaking process, that the parent "did not distinguish between itself and [the subsidiary] in [an] engagement letter . . . or in [a] Note offering," and that the subsidiary "did not perform any due diligence and had no independent discretion"); *Union Carbide Corp*, 944 F. Supp. at 1145 (finding that plaintiff's allegations that the parent forced the subsidiary to act contrary to the subsidiary's own interests to be sufficient to survive motion to dismiss).

Plaintiff urges that Cummins and CPS are functionally a single economic entity for the following reasons:  "CPS was established as a limited liability joint venture by and between Cummins Inc. and [Patrohay]," (Pl.'s Mem. 4; *see also* SAC ¶ 91); "CPS is described in both [a] Press Release . . . and on Cummins's present website as a business 'unit' of Cummins," (Pl.'s Mem. 5; *see also* SAC Ex. L); "the near entirety of the original capital contribution to CPS was provided by Cummins," and "Cummins currently holds 82% of the equity membership interest

in CPS," (Pl.'s Mem. 6; *see also* SAC ¶¶ 92–93); and "[t]here is a substantial degree of overlap between the current management of CPS and Cummins," (Pl.'s Mem. 6; *see also* SAC ¶ 102.)

These allegations, taken as true, are insufficient to support the allegation that CPS and Cummins function as a single entity for several reasons.[4]  First, it bears mention that, once again, Plaintiff has failed to allege "a single fact that addresses [the *Fletcher*] factors"; while not necessarily fatal, this omission seriously "wound[s] [Plaintiff's] claims against Cummins." *National Gear*, 861 F. Supp. 2d at 376 (collecting authority for proposition that failure to plead these factors generally results in dismissal); *see also CNH Am. LLC v. Kinzenbaw*, No. 08-945, 2009 WL 3737653, at *1 (D. Del. Nov. 9, 2009) (finding that allegations that defendant "fail[ed] to observe corporate formalities" were insufficient where plaintiff failed to establish any of the other *Fletcher* factors).

Second, the other relevant allegations relied on by Plaintiff do not get Plaintiff over the high hurdle established by Delaware law.  It is well established law that allegations of mere shared management, shared corporate principles, or a parent's ownership and operation of a subsidiary—even exclusively for the parent's gain—do not merit piercing the corporate veil. *See Bestfoods*, 524 U.S. at 61–62 ("[I]t is hornbook law that the exercise of the control which stock ownership gives to the stockholders . . . will not create liability beyond the assets of the subsidiary." (second alteration in original)); *In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 419 (S.D.N.Y. 2011) (explaining that, under both New York and Delaware law, allegations of "a mere ownership stake in a joint venture" do not support piercing the corporate veil, and

---

[4] Indeed, Plaintiff still does not employ the appropriate language for its claim, describing in its Memorandum of Law "the relationship between Cummins and CPS," as opposed to the "domination" or "control" of CPS by Cummins.  (*See* Pl.'s Mem. 3–6.)

further stating that, under both New York and Delaware law, "[i]t is clear that simply owning, *even wholly owning*, a subsidiary is insufficient to pierce the corporate veil" (emphasis added)); *In re Ticketplanet.com*, 313 B.R. 46, 71 (Bankr. S.D.N.Y. 2004) (finding allegations regarding the "significant overlap in the directors" between multiple entities, the single shareholder's "ownership interest" in "all of the entities," the shareholder's involvement in company operations, and the shareholder's use of the entities for "personal gain" were insufficient to survive a motion to dismiss); *In re RSL COM Primecall, Inc.*, No. 01-11457, 2003 WL 22989669, at *15–16 (Bankr. S.D.N.Y. Dec. 11, 2003) (finding that, under Delaware law, plaintiff's allegations supporting the subsidiary's undercapitalization, the significant overlap of executive officers between the parent and subsidiary, the ownership interests held by directors of the parent in the subsidiary, the financial instability of the subsidiary, the parent's providing "managerial and other services" to the subsidiary, and the parent's use of the subsidiary as a tool to further the parent's interests insufficient to state a claim); *accord Waite v. Schoenbach*, No. 10-CV-3439, 2010 WL 4456955, at *4 (S.D.N.Y. Oct. 29, 2010) (dismissing alter-ego claim under New York law, where plaintiff relied on "unsupported assertions" that owners and officers of one company "exercised complete dominion and control" over another company; allegations "that [the companies] operate[d] at the same location and share[d] employees, officers, owners, and bank accounts"; and statements that the companies "shift[ed] money and assets between themselves . . . in an effort to defraud creditors" (fifth alteration in original) (internal quotation marks omitted)); *Kalin v. Xanboo, Inc.*, 526 F. Supp. 2d 392, 404 (S.D.N.Y. 2007) (finding that allegations of a common address, common ownership, and common principals, without more, were insufficient under New York law to pierce the corporate veil).  Indeed, the allegations on which Plaintiff relies do no more than restate the common characteristics of a parent–subsidiary

17

relationship.  *See* William Meade Fletcher, *Fletcher Cyclopedia of the Law of Corporations* § 26 (2012) ("A 'subsidiary corporation' is one that is controlled by another corporation by reason of the latter's ownership of at least a majority of the shares of the capital stock. . . . A parent corporation does not lose the benefits of limited liability by taking an active interest in the affairs of its subsidiary, by using its voting power to elect directors, or by entering into contracts with the subsidiary, so long as the corporate formalities are observed."); *see also IGEN Int'l, Inc. v. Roche Diagnostics GmbH*, 335 F.3d 303, 309 n.5 (4th Cir. 2003) (applying Delaware law for the proposition that "the act of one corporation is not regarded as the act of another merely because the first corporation is a subsidiary of the other, or because the two may be treated as part of a single economic enterprise for some other purpose.").[5]

Third, to the extent that Plaintiff has demonstrated that Cummins possessed general control over CPS, Plaintiff has failed to offer anything more than a conclusory allegation that Cummins exercised its power over CPS in respect to CPS's specific alleged misconduct.  (*See* SAC ¶ 123 ("Cummins Inc. acts as a corporate alter ego and/or franchisor of CPS, and by virtue

---

[5] Plaintiff's reliance on *Moras v. Marco Polo Network, Inc.*, No. 11-CV-2081, 2012 WL 2025712 (S.D.N.Y. May 31, 2012), is misplaced.  There, the court found that "[a] jury could reasonably conclude that" an individual "exercised domination over" a company "based in part on his ownership stake" in the company.  *Id.* at *3.  The case is easily distinguishable, however, because that individual's "own testimony support[ed] [plaintiff's] claims that [the individual] ha[d] (1) disregarded corporate formalities, (2) intermingled his own funds with those of his companies, and (3) inadequately capitalized certain of" his companies.  *Id.*  Plaintiff has offered no such allegations here regarding Cummins.

Moreover, Plaintiff's emphasis on Cummins's use of possessive phrases regarding CPS on Cummins's website and in Cummins's marketing materials is confusing.  Indeed, it is unclear why Cummins's ambiguous statement that CPS is a Cummins "unit" in promotional materials should be controlling, where the Agreement which Cummins allegedly provides to distributors such as Plaintiff states expressly that "[CPS] and Cummins are Independent.  [Plaintiff] acknowledges that [CPS] is independently incorporated with different ownership than Cummins and without the authority to speak for or legally bind Cummins."  (SAC Ex. A § 9.2.)

of its relationship to CPS has and did have authority to exercise corporate control over CPS.  By its activity or failure to act Cummins Inc. participated in the actions of CPS with regard to the foregoing breach of the duty of good faith and fair dealing."); *id*. ¶ 138 (same with respect to tortious-interference-of-business-relations claim); *id.* ¶ 147 (same with respect to breach-of-contract claim); *id.* ¶ 165 (same with respect to antitrust claim); ¶ 185 (same with respect to Donnelly Act claim).)  Such conclusory allegations are insufficient to survive Cummins's Motion To Dismiss.  *See National Gear*, 861 F. Supp. 2d at 375 (dismissing claims as to Cummins, where Plaintiff relied on the "conclusory statements" that Cummins "failed to direct that CPS enter into a proper conduct of business with Plaintiff" (brackets and internal quotation marks omitted)); *In re BH  S&B Holdings LLC*, 420 B.R. 112, 134 (Bankr. S.D.N.Y. 2009) (explaining that, under Delaware law, "at the motion to dismiss stage, it is insufficient to make conclusory [a]llegations of mere domination or control by one entity over another" (alteration in original) (internal quotation marks omitted)), *aff'd as modified on other grounds*, 807 F. Supp. 2d 199 (S.D.N.Y. 2011); *accord Capmark Fin. Grp. Inc. v. Goldman Sachs Credit Partners*, 491 B.R. 335, 347 (S.D.N.Y. 2013) (explaining that, under New York law, "[d]isregard of the corporate form is warranted only in extraordinary circumstances, and conclusory allegations of dominance and control will not suffice to defeat a motion to dismiss" (alteration in original) (internal quotation marks omitted)).

### b. Overall Element of Injustice or Unfairness

Even if the allegations in the Second Amended Complaint were sufficient to establish the first factor—i.e., that Cummins and CPS functioned as a single economic entity—Plaintiff has failed sufficiently to plead an overall element of injustice or unfairness.  Its claim thus fails on this independent ground.

19

To satisfy this element of a veil-piercing attack, a plaintiff must allege injustice or unfairness that is a result of an abuse of the corporate form.  In other words, the corporation effectively must exist as a sham or shell through which the parent company perpetrates injustice. *See In re Sunbeam Corp.*, 284 B.R. at 366 ("There must be an abuse of the corporate form to effect a fraud or an injustice—some sort of elaborate shell game." (internal quotation marks omitted)); *Wallace*, 752 A.2d at 1184 ("Effectively, the corporation must be a sham and exist for no other purpose than as a vehicle for fraud."); *Outokumpu*, 685 A.2d at 729 ("[T]he alter ego theory requires that the corporate structure cause fraud or similar injustice."); *see also In re Ticketplanet.com*, 313 B.R. at 70–71 (citing *Wallace*, 752 A.2d at 1184); *In re RSL COM Primecall, Inc.*, 2003 WL 22989669, at *15 (same); *EBG Holdings LLC v. Vredezicht's Gravenhage 109 B.V.*, Civ. No. 3184, 2008 WL 4057745, at *12 (Del. Ch. Sept. 2, 2008) (same). Moreover, it is well established that a plaintiff's underlying cause of action alone is insufficient to satisfy the injustice requirement.  *See NetJets*, 537 F.3d at 183 ("[T]he claimed injustice must consist of more than merely the [claim] . . . that is the basis of the plaintiff's lawsuit . . . ."); *TradeWinds Airlines, Inc. v. Soros*, No. 08-CV-5901, 2012 WL 983575, at *7 (S.D.N.Y. Mar. 22, 2012) ("Plaintiffs need only show an element of injustice *distinct from the underlying wrong* which gave rise to the cause of action . . . ." (emphasis added)); *In re BH S & B Holdings LLC*, 420 B.R. at 134 (Bankr. S.D.N.Y. 2009) ("[T]he underlying cause of action, at least by itself, does not supply the necessary fraud or injustice." (internal quotation marks omitted)); *EBG Holdings*, 2008 WL 4057745, at *12 ("[T]he requisite element of fraud under the alter ego theory must come from an inequitable use of the corporate form itself as a sham, and not from the underlying claim.")*.*  "To hold otherwise would render the fraud or injustice element meaningless . . . ."  *Mobil Oil Corp. v. Linear Films, Inc.*, 718 F.Supp. 260, 268 (D. Del. 1989).

The only facts alleged by Plaintiff that even arguably go beyond the underlying contract and good-faith claims are the antitrust allegations that form the basis of the Sherman Act and Donnelly Act causes of action.  But these claims are insufficient, because Plaintiff has not sufficiently alleged Cummins's involvement in CPS's anti-competitive scheme.  Plaintiff states that "[b]y its activity or failure to act, Cummins Inc. . . . participated in CPS' unlawful scheme to restrain trade."  (SAC ¶¶ 165, 185.)  But Plaintiff has not pleaded *any* specific, non-conclusory, or non-speculative facts to support the claim that Cummins engaged in anti-competitive "activity."  Put simply:  Plaintiff does not allege that Cummins used CPS to restrain trade, but rather that CPS perpetrated an injustice that Cummins failed to stop or correct.  In this respect, this case is identical to *In re Digital Music Antitrust Litigation*, where, the court explained, the plaintiff's veil-piercing attack based on an alleged antitrust conspiracy failed, because

> [t]here are no allegations that any [p]arent [c]ompany did anything actionable in the alleged antitrust conspiracy.  Whether the joint ventures or subsidiaries did anything actionable is not relevant with respect to the liability of the [p]arent [c]ompanies absent a basis to pierce the corporate veil, and none is alleged.  Moreover, there is no allegation that the [p]arent [c]ompanies directed the subsidiaries to engage in an antitrust conspiracy.

812 F. Supp. 2d at 419.

Moreover, the Sherman Act and Donnelly Act claims are Plaintiff's underlying causes of action, and they, too, are not based on Cummins's abuse of CPS's corporate form; thus these claims, by themselves, fail to satisfy the injustice requirement, as there are no allegations of any wrongdoing by Cummins.  *See NetJets*, 537 F.3d at 183 ("[T]he claimed injustice must consist of more than merely the [claim] . . . that is the basis of the plaintiff's lawsuit . . . ."); *see also Trevino v. Merscorp, Inc.*, 583 F. Supp. 2d 521, 531 (D. Del. 2008) (explaining that to satisfy the element-of-injustice requirement, a plaintiff must allege abuse of "the corporate form in and of

21

itself . . . distinct from the alleged wrongs of the underlying corporation" (citing *Medi-Tec of Egypt Corp v. Bausch & Lomb Surgical*, Civ. No. 19760, 2004 WL 415251, at *4 (Del. Ch. Mar. 4, 2004)). Furthermore, it appears that many courts rely on the same *Fletcher* factors that are relevant to the single-economic-entity requirement when evaluating the injustice requirement. *See Trs. of Nat'l Elevator Indus. Pension, Health Benefit & Educ. Funds v. Lutyk*, 332 F.3d 188, 194 (3d Cir. 2003) ("'[A] number of these factors can be sufficient to show such unfairness.'" (quoting *United States v. Pisani*, 646 F.2d 83, 88 (3d Cir. 1981)); *MIG Invs. LLC v. Aetrex Worldwide, Inc.*, 852 F. Supp. 2d 493, 514 (D. Del. 2012) (finding that plaintiff had "adequately alleged injustice and unfairness" based on plaintiff's allegations regarding the corporation's form and structure without consideration of plaintiff's underlying claims); *Blair v. Infineon Techs. AG*, 720 F. Supp. 2d 462, 473 (D. Del. 2010) ("If plaintiffs' allegations are true—that the Infineon defendants misdirected funds, exercised crippling control, and purposely siphoned profits from the Qimonda Subsidiaries in favor of propping up Qimonda AG—then plaintiffs have sufficiently alleged that the Infineon defendants may have perpetrated an element of fraud or injustice in their use of the corporate form . . . ."). Plaintiff's failure to plead any of the *Fletcher* factors thus undercuts its claim that Cummins and CPS perpetrated an injustice. And finally, while Plaintiff need not allege that CPS is a fraudulent or sham corporation, Plaintiff must plead "something like fraud," including plaintiff's "reliance" and defendant's "intent to deceive." *In re Moll Indus., Inc.*, 454 B.R. 574, 591 (Bankr. D. Del. 2011) (noting that any distinctions between an overall element of injustice and fraud are "largely superficial" (internal quotation marks omitted)); *see also Blair*, 720 F. Supp. 2d at 471 ("Under Delaware law, the requisite injustice or unfairness is not that the parent corporation committed an actual fraud or sham but just something that is similar in nature to fraud or a sham." (internal quotation marks

omitted)).   Here, Plaintiff has not alleged that Cummins or CPS attempted to deceive Plaintiff, nor does the Court see how Plaintiff could make such an allegation, given that it signed an agreement expressly stating:  "[CPS] and Cummins are Independent.  [Plaintiff] acknowledges that [CPS] is independently incorporated with different ownership than Cummins and without the authority to speak for or legally bind Cummins."  (SAC Ex. A § 9.2.)

In sum, with respect to the single-economic-entity analysis, despite guidance from this Court as to the pleading requirements for establishing the parent's complete domination of the subsidiary, *see National Gear*, 861 F. Supp. 2d at 376 (citing *NetJets*, 537 F.3d at 177), Plaintiff has failed to plead any of the so-called *Fletcher* factors, and the facts that Plaintiff has plead merely establish that Cummins and CPS are in a parent–subsidiary relationship—which relationship is, by itself, insufficient to pierce the corporate veil.  And with respect to the injustice requirement, Plaintiff has pleaded no facts to suggest that CPS was a merely sham through which Cummins sought to perpetrate an injustice.  As such, Plaintiff has failed to meet the high burden required by Delaware law to disregard CPS's corporate form, and the Court accordingly dismisses Plaintiff's veil-piercing/alter-ego theory of liability.

### 4. Franchisor–Franchisee Relationship

Plaintiff's second theory of Cummins's indirect liability for CPS's conduct is that "the relationship between Cummins and CPS is akin to that of a Franchisor and a Franchisee."  (Pl.'s Mem. 9; *see also* SAC ¶ 104.)  Defendant counters that Plaintiff's reliance on this theory is misplaced and that the legal requirements for imposing vicarious liability on Cummins should be the same, regardless of how Plaintiff's attack is labeled.

It appears that under any body of law, to impose vicarious liability against a franchisor, a plaintiff must allege the existence of a franchise agreement, which grants the franchisor

meaningful control over the franchisee's day-to-day activities, and which control the franchisor exercised with respect to the conduct or injury at issue.[6]  *See Karnauskas v. Columbia Sussex Corp.*, No. 09-CV-7104, 2012 WL 234377, at *3 (S.D.N.Y. Jan. 24, 2012) (collecting authority for the proposition that a franchisor "may be held liable," where the franchise agreement grants the franchisor "considerable day-to-day control over the specific instrumentality that is alleged to have caused the harm"); *see also Toppel v. Marriott Int'l, Inc.*, No. 03-CV-3042, 2008 WL 2854302, at *4–5 (S.D.N.Y. July 22, 2008) (explaining that, "[u]nder New York law, when determining whether a franchisor is vicariously liable for acts of its franchisees, the most significant factor to consider is the degree of control that the franchisor maintains over the daily operations of the franchisee," and further explaining that courts "look[] to the terms of the franchise agreement to determine the extent of the franchisor's control over the operations of its franchisee" (footnote and internal quotation marks omitted)); *Wendy Hong Wu v. Dunkin' Donuts, Inc.*, 105 F. Supp. 2d 83, 87–94 (E.D.N.Y. 2000) (describing that, under New York law, franchisor liability exists where the franchisor exerts a "considerable" degree of control over a franchisee's "day-to-day" activities; noting that "decisions by courts in other states" follow the same rule; and explaining that courts consider the terms of the franchise agreement when evaluating a franchisor's degree of control); *Billops v. Magness Constr. Co.*, 391 A.2d 196, 197–98 (Del. 1978) (explaining that "[i]f, in practical effect, [a] franchise agreement goes

---

[6] Here too, the Parties largely ignore the choice-of-law issue.  Plaintiff invokes federal regulations governing franchise relationships, as well as New York, Connecticut, Delaware, Indiana, and Virginia law, (*see* Pl.'s Mem. 10–12), whereas Cummins relies primarily on New York law, (*see* Mem. of Law in Supp. Of Cummins's Mot. To Dismiss All Claims Against Cummins Pursuant to Federal Rule of Civil Procedure 12(b)(6) 10–11).  The Court need not engage in a full choice-of-law analysis, however, because, as the Court will explain, there is no conflict.

beyond the stage of setting standards, and allocates to the franchisor the right to exercise control over the daily operations of the franchise," vicarious liability may be imposed against the franchisor); *Cumpston v. McShane*, No. 06C-11-051, 2009 WL 1566484, at *2–3 (Del. Super. Ct. June 4, 2009) (explaining that "[u]nder Delaware law," a franchisor faces vicarious liability for a franchisee's actions when there is an "agency relationship," and further explaining that such a relationship exists where, either the franchisor "controls, or has the right to control the latter's business," according to the terms of the "franchise agreement," or where the franchisor "represents . . . apparent authority" to a third party that "[the franchisee] is [the franchisor's servant] and causes [the third party] to justifiably and reasonably rely").

Plaintiff has failed adequately to plead any of these requirements.  There are no specific allegations in the Second Amended Complaint that there is a franchise agreement between Cummins and CPS;[7] that such an agreement—or any agreement for that matter—grants Cummins significant control over the day-to-day activities of CPS; or that Cummins exercised that control with particular respect to CPS's allegedly unlawful conduct.  These omissions are fatal to Plaintiff's claim that Cummins may be held indirectly liable based on its commercial relationship with CPS.  *See Karnauskas*, 2012 WL 234377, at *3 (surveying cases from multiple states and explaining that "[t]he majority of courts apply a degree-of-control analysis"; franchisor liability is appropriate only where the franchisor has "considerable day-to-day control over the specific instrumentality that is alleged to have caused the harm"); *Toppel*, 2008 WL 2854302, at *4–5 (same under New York law); *Cumpston*, 2009 WL 1566484, at *2–3

---

[7] Indeed, this omission is hardly surprising; Plaintiff is, after all, claiming that the relationship between Cummins and CPS is "*akin* to that of a Franchisor and a Franchisee."  (Pl.'s Mem. 9 (emphasis added).)

(explaining that, under Delaware law, franchisor liability is appropriate, where there is an agency

relationship—i.e., where the franchisor exerts actual day-to-day control, or where there is

apparent day-to-day control).

> Plaintiff responds that
>
> Cummins Inc. maintains substantial control over the activities of CPS and
> participates directly in the business results of CPS.  The control of CPS by
> Cummins Inc. is based on Cummins Inc.['s] equity membership interest in CPS;
> the operational integration of CPS into the Cummins Inc. business model, and
> (upon information and belief) the provisions of the Agreement that governs [sic]
> the relationship between Cummins Inc. and CPS.

(SAC ¶¶ 104–05.)  These conclusory allegations are insufficient to establish Cummins's

franchisor liability.  Cummins may possess a significant membership interest in CPS, and the

two entities may be largely integrated, but Plaintiff has not pleaded how Cummins exercised its

control over CPS, either in general or specifically in regard to Plaintiff.  Plaintiff does not plead,

for example, that Cummins had or exercised control over CPS's communications with

purchasers such as NYCTA, that Cummins developed the bidding restrictions and other practices

that CPS imposed on Plaintiff starting in 2009, or that Cummins directed CPS to terminate its

agreement with Plaintiff.  In the absence of such allegations, Plaintiff's indirect-liability claims

against Cummins fail.  *See Karnauskas*, 2012 WL 234377, at *3 (collecting authority for the

proposition that a franchisor "may be held liable" for franchisee's conduct, where the franchise

agreement grants the franchisor "considerable day-to-day control *over the specific

instrumentality that is alleged to have caused the harm*" (emphasis added)); *Trevino*, 583 F.

Supp. 2d at 531 (explaining that, under Delaware law, to impose liability "under an agency

theory," a plaintiff must allege that there is "an arrangement between the two corporations so that one acts on behalf of the other," and that "the arrangement [is] *relevant to the plaintiff's claim of wrongdoing*" (emphasis added) (internal quotation marks omitted)).[8]

Plaintiff also claims that Cummins had authority "to terminate its relationship with CPS and/or to terminate CPS's franchise agreement in the event CPS act[ed] in a manner that is contrary to applicable law and/or the Cummins Inc. Code of Business Conduct."  (SAC ¶ 112.) Plaintiff further alleges that it put Cummins on notice that CPS engaged in conduct contrary to Cummins's Code of Business Practice on several occasions, but Cummins never intervened—for example, by correcting CPS's actions or by terminating its agreement with CPS.  (*See id.* ¶¶ 113–17.)  Plaintiff's reliance on Cummins's Code of Business Practices is misplaced.  To the extent that Plaintiff's argument is that Cummins should be held liable specifically for its inaction in the face of Plaintiff's letters, the argument fails:  Plaintiff has, to this point, offered nothing more than conclusory assertions that CPS engaged in conduct that was contrary to Cummins's Code of Business Practices.  (*See* SAC Ex. O (letter from Plaintiff's counsel to Cummins in 2010 stating that CPS engaged in conduct "*which* [*Plaintiff*] *believes* to be a violation of [the Donnelly

---

[8] Plaintiff's Memorandum of Law underscores, rather than cures, these pleading deficiencies.  Plaintiff cites Federal Trade Commission materials which highlight several indicia of control that can serve as a basis for franchisor liability, including "[s]ite or location approval; specification of site design or appearance requirements; specified hours of operation; specified production techniques; mandated accounting practices; personnel policies and practices; promotional campaigns requiring franchisee participation or financial contribution; restrictions on customers; and location or sales area restrictions."  (Pl.'s Mem. 10.)  But Plaintiff has failed to plead, with any specificity, such indicia in the Second Amended Complaint.  Moreover, Plaintiff now argues that Cummins's corporate filings exhibit "some of the controls exercised by Cummins over CPS," such as "territory restriction[s]; [a] restriction on the right to sell competing products; [a] right to terminate" for "certain . . . reasons," including " inadequate sales."  (*Id.* at 18.)  But these aspects of Cummins's control over CPS have nothing to do with CPS's allegedly unlawful conduct with respect to Plaintiff.

Act]" (emphasis added)).  Cummins's failure to act in response to this letter is an insufficient

basis to find that Cummins was involved in CPS's allegedly unlawful conduct.  If, instead,

Plaintiff's argument is that Cummins's authority to terminate its relationship with CPS

demonstrates Cummins's day-to-day authority over CPS, Plaintiff is wrong as a matter of law:

"[T]he right to terminate a franchise agreement should the franchisee not follow mandatory

procedures is generally insufficient to establish the requisite control." *Helmchen v. White Hen*

*Pantry, Inc.*, 685 N.E.2d 180, 182 (Ind. Ct. App. 1997); *cf. Billops*, 391 A.2d at 197–98 (finding

franchisor liability appropriate where "[f]ranchisor[] ha[d] issued to the franchisee a *detailed and*

*in parts mandatory, operating manual*," which regulated "such matters as identification,

advertising, front office procedures, cleaning and inspection service for guest rooms and public

areas, minimum guest room standards, food purchasing and preparation standards, requirements

for minimum supplies of 'brand name' goods, staff procedures and standards for soliciting and

booking group meetings, functions and room reservations, accounting, insurance, engineering

and maintenance, and numerous other details of operation"; where franchisee was required "to

keep detailed records in order for the franchisor to insure compliance"; where the franchisor

"retain[ed] the right to enter the premises" to inspect for compliance; and where the franchisor

could terminate the agreement if the franchisee violated the manual "and such violation

continues for a period of twenty (20) days after written notice" from the franchisor).

   Finally, so far as the Court can tell, Plaintiff does not argue that, because Cummins had

"apparent" authority over CPS, it may be held liable for CPS's conduct.  *See Cumpston*, 2009

WL 1566484, at *2–3 (explaining that "[u]nder Delaware law," a franchisor faces vicarious

liability for a franchisee's actions when there is an "agency relationship," which can be

established where the franchisor "represents . . . apparent authority" to a third party that "[the

franchisee was the franchisor's servant] and causes [the third party] to justifiably and reasonably

rely").  Indeed, such an argument would be thoroughly unpersuasive.  As the Court has already

noted, Plaintiff signed an agreement which expressly provides that "[CPS] and Cummins are

Independent.  [Plaintiff] acknowledges that [CPS] is independently incorporated with different

ownership than Cummins and without the authority to speak for or legally bind Cummins."

(SAC Ex. A § 9.2).  In light of this document, it would be untenable to find that Plaintiff

nonetheless "reasonably" believed that CPS was Cummins's servant.

### 5. Leave To Amend

Cummins argues that because the Court has afforded Plaintiff multiple opportunities to

plead allegations establishing Cummins's direct or indirect liability for CPS's conduct, *see*

*National Gear*, 861 F. Supp. 2d at 375, 377 & n.16, and because there is no indication that *any*

facts exist supporting Cummins's liability, the Court should dismiss Plaintiff's claims against

Cummins with prejudice, *see, e.g.*, *Solow v. Citigroup, Inc.*, No. 10-CV-2927, 2012 WL

1813277, at *10 (S.D.N.Y. May 18, 2012) (collecting authority for proposition that leave to

amend need not be granted more than once, where a plaintiff fails to plead a valid cause of action

in an amended complaint); *Martinez v. Ravikumar*, 616 F. Supp. 2d 455, 460 (S.D.N.Y. 2009)

(dismissing with prejudice where plaintiff "has already had two opportunities to file a complaint

that satisfies" the pleading standards).  Plaintiff counters, (*see* Pl.'s Mem. 18–19), that its veil-

piercing attack in particular is a "fact-laden claim," and that the relevant information is all in

Defendants' possession, such that early—i.e., before discovery—dismissal with prejudice is

inappropriate.  *See First Bank of Ams. v. Motor Car Funding, Inc.*, 690 N.Y.S.2d 17, 22 (App.

Div. 1999).  The Court agrees with Plaintiff that dismissal with prejudice is inappropriate at this

early stage in the litigation.  But Plaintiff has not yet demonstrated that any claim against

Cummins could be viable. The Court therefore does not grant Plaintiff leave to file a Third

Amended Complaint at this point. If, in the course of discovery against CPS, Plaintiff discovers

sufficient facts to assert claims against Cummins, Plaintiff may file a Motion To Amend, and the

Court will consider its merits at that time. For now, however, Cummins is dismissed from this

case.

### III. Conclusion

For the reasons stated herein, Cummins's Motion To Dismiss is granted. The Clerk of

Court is respectfully directed to terminate the pending motion. (Dkt. No. 82.)

SO ORDERED.

Dated:      White Plains, New York
            September 27 , 2013

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE